Company, oral argument that is conceived 15 minutes per side. Mr. Toshio for the accountants. Good morning. May it please the court. My name is David Torchia. I'm here for the appellant, Andrea Soudou, and I would like to reserve four minutes for rebuttal, please. As the court is aware, this appeal involves Mr. Soudou's claim for over a million, several million dollars worth of stock options that he earned while he was employed at Proctor and Gamble's European entities. The district court held that Mr. Soudou waived his claim for those options through two agreements that he signed at around the time of his separation from the Proctor and Gamble European entities. We're here this morning to ask the court to reverse the district court's decision and to, at a minimum, remand the case for trial on disputed issues of fact regarding the intent of the parties, or alternatively, to remand the case with directions to enter judgment in Mr. Soudou's favor, because we believe no reasonable juror could find that Mr. Soudou waived his claims and that there was a special separation in this case that qualified him to exercise his options after his termination. There are two arguments that we made in the brief I'd like to focus this morning, obviously. Your position is there was a special separation or there was not? There was, Your Honor. There was. It was on the stock option issue as opposed to the decision not to unseal part of the record. As the court knows, Mr. Soudou was a high-level executive at Proctor and Gamble employed by its European entities. The options that he was granted over a period of years came from Proctor and Gamble USA, located right here in Cincinnati. The options that Mr. Soudou received were a matter of contract between Proctor and Gamble USA and Mr. Soudou. They were not a matter of Belgian law, Italian law. They weren't part of the employment contract that Mr. Soudou had with Proctor and Gamble Europe or Proctor and Gamble Italy. So we're dealing with a contractual matter between Mr. Soudou and Proctor and Gamble USA here in Cincinnati. The options were governed by the 1992 Proctor and Gamble stock plan. Again, this is Proctor and Gamble USA, not Proctor and Gamble Europe or Proctor and Gamble Italy. According to the plan and, Judge, to your question, options could be exercised for as long as Mr. Soudou was employed or in the event of a special separation after his employment ended. And the plan describes or defines a special separation as a termination that is not for cause or a termination that's not initiated by the employee. That term of art, though, doesn't appear in either agreement, does it? That's correct. In fact, the word stock options doesn't appear anywhere in the Belgian agreement, and there's only a limited passing reference to it in the Italian agreement. It's our position that Mr. Soudou, when he left Proctor and Gamble in December of 2002, left under circumstances that clearly qualified him for a special separation. The details of the facts leading to the separation are spelled out in a lot of detail in the Italian agreement at appendix pages. I don't have those with me. But the Italian agreement makes it very clear that Mr. Soudou was not terminated for cause, that this was a mutual separation initiated by Proctor and Gamble because there was no suitable position available for Mr. Soudou after he resigned from the joint venture in Italy where he worked just prior to his separation from the company. Mr. Soudou, after he signed the agreements... Counsel, do the broad release clauses bear on the idea of this as a special separation? Judge, the language in the releases don't address that issue. The special separation is something that's... You'd agree they're broad. They release all claims. I think they're more limited than that, Judge. I think particularly in the Italian agreement, there are limitations on the extent of the waiver. The paragraph 7 that contains the waiver talks about claims, that Mr. Soudou was giving up claims that arose based on Belgian law and Italian law and customs and policies in Belgium and Italy. This case, this claim, arises from... The idea of a special separation qualifying your client to exercise these options much later strikes me as somewhat inconsistent with the separation that included releases. Judge, what's odd about this case is that while the two agreements included some releases, there is no dispute that after Mr. Soudou signed those two agreements with the waivers that Procter & Gamble says apply to the stock options, there's no dispute at all that after he signed those agreements, he exercised stock options and was paid. He exercised them according to the 1992 plan, and he was paid by Procter & Gamble for those options pursuant to the plan, an additional $1.5 million. That's in addition to the consideration that he received under the two separation agreements. Is that consistent with the letter, the Pease letter? Judge, the Pease letter... I'm not asking... I just want to know if what you just described is consistent with that letter. I believe part of that letter. The first sentence of the Pease letter says that Mr. Soudou's options will be handled according to the company plan in Cincinnati, Ohio. Mr. Pease goes then on to describe deadlines for him to exercise those options. These ones that you say were exercised were consistent with that, those deadlines? Some were consistent with those deadlines. The ones that were granted were consistent with the deadlines. Were there any that were granted that weren't consistent with the deadlines? There were some that didn't have any value at that time that Mr. Soudou... So they weren't exercised. Correct, correct. So it's a little misleading to say that they were exercised inconsistent with that deadline. Well, they were exercised at that time because Mr. Soudou needed cash. Right, but that was consistent with that letter at that time. Correct, correct. But Judge, one thing that I think is important here, and we didn't really say it in these terms in the brief, but it appears that both sides were operating under the plan. We have the Pease letter saying your options are going to be governed according to the plan. Mr. Soudou exercised some options according to the plan. Again, this is after the two agreements were signed. And what we boil down to is basically an agreement between the parties that they're proceeding according to the plan. And the dispute that arises then is if we're proceeding according to the plan, is this a special separation or not? Procter & Gamble is taking the position that it's not. Mr. Soudou is taking the position that it is. The Pease letter, which you partially are relying on, has deadlines which would only make sense if it was not a special separation, right? Those deadlines, correct, Your Honor. Those are deadlines that would be consistent with a separation that was not a special separation. But when you go back to the agreements and you look at the circumstances under which Mr. Soudou left Procter & Gamble, those facts describe ultimately what is a special separation. He wasn't terminated for cause. He didn't resign on his own. Those are the two elements that make up a special separation. And the two settlement agreements signed by Procter & Gamble's attorneys and Mr. Soudou say just that. There was no mention of misconduct. There's no mention of a termination for cause. There's no mention of a voluntary resignation initiated by Mr. Soudou. So we believe that the issue and what started this case is, is this a special separation or not? As a matter of contract interpretation, should we look at the Pease letter at all? I mean, you like part of it, you don't like part of it, but should we even look at it? Judge, I don't think you have to look at it. Should we look at it? I mean, as a matter of law, may we consider the content of that letter? I believe, Judge, that you can because the Adams case, which we cited in our brief, says when you try and determine the intent of the parties, you look at all the surrounding circumstances. And that letter, I think, is one of the surrounding circumstances. I don't think we need the Pease letter to show that the parties were operating according to the plan. I think the Pease letter confirms, at least, that the plan was governing Mr. Soudou's options. The dispute is whether or not this is a special separation or not. P&G and Mr. Pease apparently took the position that it was not. That's why we're here. We believe that it was a special separation, again, based on the written words that are in the two agreements that Mr. Soudou was not fired for cause and that he didn't initiate the separation. I just want to touch quickly on, as further evidence that the parties did not intend to waive every possible fringe benefit claim that Mr. Soudou had, we mentioned in the brief the free pension promise, which is a very substantial benefit that Mr. Soudou will get at age 60. There's no dispute as to that, though. No dispute that he'll get it. But it wasn't mentioned in the agreements. Procter & Gamble has never taken the position that it was waived. But that's not at issue, though, right? Not in terms of damages, Judge. But I think it's further evidence that these two agreements were not, in and of themselves, intended to dispose of every possible claim. Does Procter & Gamble say that it wasn't waived? Or are they saying, we have a legal right not to pay that, but we are going to pay that in this case? Well, they've said two different things, Judge. Earlier in the district court, Procter & Gamble argued that that benefit could not be waived, that it was an ERISA type of benefit that, as a matter of law, couldn't be waived. Now, in this court, for the first time, they've said that it could. We are just using our discretion not to deny Mr. Soudou that benefit. So I think that creates another dispute, question of fact, in terms of the intent of the parties.  Thank you, counsel. Thank you. Good morning. May it please the court, my name is Michael Glassman, and I'm here on behalf of the Procter & Gamble Company. As is apparent from the parties' briefs, this case does involve the heavily negotiated departure in late 2002 of a very senior business executive in lieu of termination for cause, which was under active consideration at that time. The plaintiff is a sophisticated, highly educated business person who was represented in connection with his departure by counsel, who, according to the plaintiff, was a very expert labor and employment attorney who was also a labor law professor at the Rome Law School. And he was also represented in connection with these agreements by a union representative under the Italian system. While he was employed, he got a basket of compensation and various fringe benefits that included stock options, which he could have exercised while he still was an employee. And in connection with his departure, the parties entered into, as we've heard, not one but two settlement agreement and releases. And in exchange for his releases, he received an extremely generous separation pay as consideration for entering into those agreements and releasing his rights. And I don't think he would disagree with anything you've said so far. I don't think so either. So why don't you get to the part where you disagree? Okay. Well, I think that the Belgian agreement, both agreements have very broad releases, which includes the releases of the right to exercise stock options. Much has been made, and it's been argued here today that these are $4 million roughly. The fact is, at that time, they were worth nothing. So it was into the future. That's any stock option is like that, isn't it? I mean, it might not be valuable now, but it might be valuable later. That's the whole nature of those things, isn't it? It might be. In exchange for the if-come, if you will, he entered into the release, giving up the right for all fringe benefits, including the exercise of the stock options, in exchange for the significant consideration that was paid at the time that was at risk if he did not enter into this agreement and if the company proceeded with the termination of the clause. If one of the things that was part of the package was something that might become valuable later, how do you give up now the possibility that you'll be denied it when it becomes valuable later? That's the trouble I'm having with this. I mean, the assumption is, on his part, he says, I got these stock options, which means if they become valuable later, I'll be able to cash them. Then later, when they become valuable, I can't cash them. You say, well, you gave that up. I mean, there was no way to know you were giving that up if you thought you were getting the stock options. Well, he could have carved that out in the settlement agreement, just like he carved out and the parties agreed to carve out in the Belgium agreement in Articles 3 and 4 certain other valuable things that he would get in the future, that it was made expressly clear that these were not part of the otherwise all-inclusive releases that he signed. The Starbonus, the ISOP, the International Retirement Agreement were all carved out from that. As you say, he's very sophisticated, you're very sophisticated. Maybe he thought he didn't need to carve it out because it was already there. He had stock options under the plan. That's his argument anyway. I have stock options under the plan. I get them under the plan. And then the plan doesn't pay me. That doesn't seem like something you should have had to negotiate if you already, as sophisticated lawyers, believed that you had it already. I would respectfully disagree with that premise, Your Honor. But what's the answer? You just say it's not true. It's not true because being at that level of sophistication in the face of an otherwise all-inclusive release, it is obligatory, I would submit, that you do carve it out. Otherwise, you've given up everything in the face of releasing any claims, including claims against the Procter & Gamble company, the very entity that he sued in this litigation. Were there some options exercised after the execution of these waivers? There were. What if, at that point, Procter & Gamble just decided not to honor those? That's a hypothetical question. I know it didn't happen. What if it had happened? If they were exercised after… After the waivers were signed. That's the hypothetical. They were. In fact, they were signed, if I recall, on December 19, 2002, and he exercised them later in December. But under the terms of the agreement, his employment still continued until December 31. So he exercised them while he still was an employee before his employment term ended. And my question is, what if he had done that and they'd been denied? Procter & Gamble just didn't like paying him. It's a hypothetical question. Would you now be arguing you didn't have to pay him because you waived everything when you signed it on the 19th? No, because the release went into effect when his employment terminated on December 31, 2002. The release went into OIC, so it wasn't effective yet, so he could still challenge it? I'm not sure I understand the question. Well, it just seems like your argument might prove too much. Your argument might prove that they don't even have to pay the ones that they did pay. They just did it out of niceness. Because it seems to say as soon as they waived, then Procter & Gamble can do whatever they want and you can't sue. That's my question. I'm not saying it's dispositive. I just don't want to know what the answer is. Under the terms of the agreement, his employment terminated on December 31, and he was entitled to exercise the options while he was employed, which was until December 31. But I thought your argument was on December 19, any right to sue about anything evaporated. No, because he still was an employee. It evaporated on December 31. So these are waivers as of the time that my employment ended. And then just so to provide a complete answer, under certain of the options, under the Belgium plan, under Belgium law, he had 30 days after, or one month actually, not 30 days, but one month after his employment terminated to exercise those options. And P&G respected that provision of the law as well. It's really kind of somewhat of an academic point because he exercised them all while an employee, still later in December. How do you assess the argument with respect to the special separation? Why is that not an opening for him? Because he released everything in the release. It was not a special separation. He gave up. If it were a special separation, counsel, you heard argues that it fits the definition of a special separation, which would offer more options even in the face of the release. I heard the argument that it was a special separation, but this was not a special separation. Why not? For several reasons, Your Honor. For the fact that under the circumstances under which the departure occurred, it was a negotiated settlement under which he released all of his claims. It was heavily negotiated in lieu of a termination for a cause that was under active consideration at that time, as we've gone into detail in our briefs. That just doesn't fit with the natural reading of the definition, though, so you would agree? Of the definition of a special separation? Well, under the Belgium plan, under which certain of the stock options that were granted that he tried to exercise five years after his termination, the terms under which those stock options were issued, the plan provides that a letter actually designating the departure as a special separation must be issued by the Procter & Gamble company, by the defendant. So you dispute the definition that we've all been operating on as to what a special separation is? Yes, with respect to certain of those options, I do dispute that. What about the options at issue in this case? They are certain of the options at issue. For example, Appendix 9 and 10 is the 1992 stock option plan. Article G, paragraph 6 provides that a letter has to be issued. Do you refer to this in your briefs? I don't believe that's specifically referred to in the briefs. You were maybe arguing the irrelevance but not arguing the definition of special separation. Now you seem to be coming up with a new argument for what a special separation is. Well, it's both. With respect, the plan was later amended to remove for options that were later issued the requirement to be issued a letter. But I also think it is irrelevant because in this situation, Mr. Sodu released all claims, including the claim that this was a special separation. It's not explicitly referred to in that, I think as Judge Cook pointed out. But the fact is, the releases are so broad, it says in both of them. So it supersedes the definition? Yes.  Well, it's both. It really is both. But I think the superseding is certainly the stronger argument. It's pretty hard to argue that it doesn't meet it, though, under the natural reading of the terms. Well, I think that's a second. Unless you come up with a different definition. For certain of the options, there is. What about the others, then? The others, it is a different definition. You don't need the letter. But it is superseded by the breadth of the release in this particular case. What's the relevance of the Pease letter? Well, we would submit with respect to the Pease letter, it is parole evidence that need not, not, not to be considered. But even if you consider, even if it is considered, I think the Pease letter, read in its entirety, is entirely supportive of the defendant's position in this case. In that, he had the right to exercise them, as I described earlier, for the time period that he remained an employee until December 31st. And with respect to certain ones, the one month after his termination. That's precisely what the Pease letter says. And is entirely consistent with the broad release of his right to exercise any options after the fact. So, if it's not considered, as we submitted, ought not to be considered. The releases are broad enough to cover it. If it is considered, it's entirely consistent. We would submit that Judge Weber's decision was accurate either way, whether or not the Pease letter is considered. If, we would submit that employers, particularly global employers who have employees across the globe, must be able to rely on broad releases, like is, like are present here. And that they can't be subject to having employees, or former employees, come back five years after the fact and file claims for things that they have released in their waivers. The trouble with that argument is it makes it very difficult for you to have a global release when something that's part of the release is something that will mature later. Because the people who enter into the agreement aren't going to be able to rely on the other party to conform to the element of the package that's going to mature later. Or maybe, mature is the wrong word, maybe come to pass on a contingency later. Like a life insurance policy. You gave me a life insurance policy. I thought it was a life insurance policy. But five years later when X died, you refused to pay it and say that I waived that. That's kind of hard then to use a life insurance policy as part of the bundle of things that constitutes the package. You see the concern I'm having? I would respond in two ways to that, Your Honor. First of all, it would have been very simple to carve it out. It was matured at that particular time. It just simply was not of any value at that particular time. And the fact that he exercised all of them that were above water, even ones that were minimally above water, is perfectly consistent with the fact that he knew he released everything at that time and would be unable to exercise options down the road. He may just have been exercising caution given the fact that he read the Pease letter. Presumably he read it. I suspect he did read it. And he exercised it because it was perfectly consistent with the release that there was a hard and fast deadline that he had to exercise those options and would be unable, by virtue of his release, to exercise them years later. Are my times up? Thank you, Your Honors. Unless the court has questions, I don't have any particular responses to any of Mr. Glassman's arguments. No, thank you. All right.  Case will be submitted.